1   Tina Wolfson (State Bar No. 174806)
2   twolfson@ahdootwolfson.com
    Robert Ahdoot (State Bar No. 172098)
3   rahdoot@ahdootwolfson.com
4   Theodore W. Maya (State Bar No. 223242)
    tmaya@ahdootwolfson.com
5   Rachel Johnson (State Bar No. 331351)
6   rjohnson@ahdootwolfson.com
    **AHDOOT & WOLFSON, PC**
7   2600 West Olive Avenue, Suite 500
8   Burbank, CA 91505
    Tel: (310) 474-9111
9   Fax: (310) 474-8585

10  *Attorneys for Plaintiffs*

11

12              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
13                    **SAN JOSE DIVISION**

14

15  VICKIE SHERMAN, LEZAH            Case No. 5:20-cv-8721
    NEVILLE-MARRS, KATHERINE
16  LOOPERS, AND JARRED JOHNSON,     **CLASS ACTION COMPLAINT**
    individually and on behalf of all others
17  similarly situated,              **MONOPOLIZATION OF SOCIAL**
                                     **NETWORK MARKET**
18                                   Violation of the Sherman Act (15 U.S.C. §
                                     2)
19                 Plaintiffs,
                                     **MONOPOLIZATION OF SOCIAL**
20      v.                           **MEDIA MARKET**
                                     Violation of the Sherman Act (15 U.S.C. §
21  FACEBOOK, INC., a Delaware       2)
    corporation headquartered in California,
22                                   **VIOLATION OF UNFAIR**
                 Defendant.          **COMPETITION LAW**
23                                   Cal. Bus. & Prof. Code § 17200
24
                                     **UNJUST ENRICHMENT**
25
                                     **DEMAND FOR JURY TRIAL**
26

27

28

---

CLASS ACTION COMPLAINT, Case No. 5:20-cv-8721

Plaintiffs Vickie Sherman, Lezah Neville-Marrs, Katherine Loopers, and Jarred Johnson (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action complaint for equitable relief and treble damages under the Sherman Act, 15 U.S.C. § 2, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

## I.   NATURE OF THE ACTION

1.   The social network market is now stagnant. Facebook's sites (including Instagram) account for 75% of all user time spent on social networks, and Facebook.com captures roughly 50% of the billions spent annually on digital display advertising. These percentages have been stable for years, but Facebook's revenues, both in an absolute sense and as a multiple of its costs, are rising. No rival in the last decade has captured more than 5% of the social network market. And because the market is characterized by strong network effects, barriers to entry are high already. Facebook collects monopoly rents, manages the flow of information to most of the nation, and engages in virtually unlimited surveillance, and will continue to do so into the foreseeable future.

2.   Facebook's weaponization of user data and its strategy to "acquire, copy, or kill" competitors have been wildly successful at the expense of consumers. Facebook's anticompetitive scheme has lessened, if not eliminated, competition and harmed consumers.

3.   Absent Facebook's anticompetitive scheme, in a competitive market, Facebook's constituents of consumers, digital advertisers and content creators would enjoy the best social network Facebook can provide. Fair competition would require Facebook to provide consumers greater value in return for consumers' data and a more transparent advertising service. Facebook instead took that data without providing adequate compensation to its users (*i.e.,* the members of the putative class in this action). That constitutes antitrust injury. Through its deception and the acquisitions enabled by such deception, Facebook fought for at least a decade to avoid competition on the merits in the social networks market. As a result, users receive a lower quality product for their data than they would receive in a competitive market.

4.     More than 40 attorneys general, the U.S. government, and Federal Trade Commission are preparing to file antitrust actions against Facebook, alleging that the tech giant engaged in unlawful, anticompetitive tactics to buy or kill off its rivals and solidify its dominance in social networking.

5.     Facebook has engaged in a long-term, integrated, anticompetitive strategy of half-truths about its privacy policies, exclusionary API manipulation, and anticompetitive acquisitions of nascent competitors that led to its current dominance of a market in which it now wields significant power over consumers and advertisers. The methods used by Facebook to achieve monopoly violated US antitrust law and harmed consumer welfare.

6.     Like the other Facebook User class members, Plaintiffs have maintained a Facebook account despite having their privacy violated and being very disappointed in what the platform has become.  Advertiser and Marketing Plaintiffs, like the other Advertiser class members, suffered economic losses as a result of Facebook's monopolization of social media advertising market and seek appropriate equitable relief and damages through this action.

## II.   JURISDICTION AND VENUE

7.     This Court has original jurisdiction over Plaintiffs' federal antitrust claim under the Clayton Act, 15 U.S.C. § 15.  The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendant, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

8.     Venue is proper in this District under 28 U.S.C. § 1391.  Facebook transacts business within this District, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District. A substantial part of the events giving rise to Plaintiffs' causes of action occurred in or emanated from this District.

9.     This Court has personal jurisdiction over Facebook because it is subject to general jurisdiction in the State of California, where it maintains its headquarters and its principal place of business, and Facebook's Terms provide that consumers must bring these claims in this Court. The scheme to monopolize alleged in this Complaint caused injury to

1    persons throughout the United States, including in this District. Moreover, Facebook also

2    conducted substantial business from which the claims in this case arise in California and has

3    agreed to personal jurisdiction in this Court.

4         10.   This action is properly assigned to the San Jose Division of this District, pursuant

5    to Civil Local Rule 3-2(c) and (e), because Facebook is headquartered, and a substantial part

6    of the events or omissions that give rise to the claim occurred, in San Mateo County, which

7    is served by the San Jose Division.

8                                    **III.  PARTIES**

9    **A.   Plaintiffs**

10        11.   Facebook is comprised of a two-sided non-transactional market, the social

11   networking market and the digital advertising market separately.

12   **Facebook Account Holders**

13        12.   **Plaintiff Vickie Sherman** is a citizen of the State of Arizona. Ms. Sherman

14   opened her Facebook account in 2010 to connect with friends and family. Ms. Sherman

15   accesses the Facebook mobile app and also uses Facebook Messenger several times per day.

16        13.   Ms. Sherman cares about her privacy online and initially entrusted her personal

17   information and activity to Facebook. She has tried to adjust her account privacy settings on

18   multiple occasions but found them difficult to navigate. She now feels she has no clear

19   understanding of what Facebook does regarding her data and online privacy, and finds its

20   conduct extremely invasive. Had she known the truth about Facebook's practices, she would

21   not have agreed to provide Facebook with so much of her personal information.

22        14.   Ms. Sherman is generally very unhappy with Facebook's services and would use

23   an alternative platform if one was available to keep in touch with family and friends. Ms.

24   Sherman spends more time on the platform than she would like due to the algorithms

25   intended to increase engagement. She also has observed the quality of content in her feed

26   decrease overtime to become more political in nature, more extreme, and more shocking.

27        15.   **Plaintiff Lezah Neville-Marrs** is a citizen of the State of Texas.  Ms. Neville-

28   Marrs opened her Facebook account in 2004 to connect with friends and family. Ms. Neville-

Marrs uses the Facebook app regularly and Facebook Messenger to keep in touch with friends and family daily. She also opened an Instagram account in 2016.

16.   Ms. Neville-Marrs cares about her privacy and tried to adjust her privacy settings on multiple occasions but found them confusing to navigate. She feels she has no true understanding of what Facebook does regarding her privacy but feels deceived and manipulated by Facebook's privacy representations. Had she known about Facebook's practices she would not have agreed to provide Facebook with so much personal information.

17. Plaintiff Neville-Marrs is unhappy with Facebook's platform. The content primarily consists of ads that are not relevant to her and other upsetting and outrageous content. Plaintiff Neville-Marrs continues to use Facebook's platform because it is the only option available to connect with family and friends.

**Advertisers – Direct Buyers**

18.   **Plaintiff Katherine Loopers** is a citizen of the State of California. Ms. Loopers purchased advertising for her non-profit, The Cadillac Hotel, which provides events and concerts for low-income residents. She paid Facebook to place advertisements to promote awareness for these events. Ms. Loopers has spent approximately $1621 purchasing ads on Facebook since 2014.

19.   Ms. Loopers has paid supra-competitive prices for Facebook's ad services and has been harmed by lack of transparency that would provide insight into effectiveness of her ad campaigns. The results did not yield the results expected based on the price paid. She had no way of knowing who the ads reached and how many times an ad was viewed.

**Advertisers – Marketers**

20.   **Plaintiff Jarred Johnson** is president of a marketing firm based in Tennessee. Mr. Johnson spends over $1 million annually on Facebook ads to run online marketing campaigns for legal services.

21.   Plaintiff Johnson's profit from his marketing campaigns has continually decreased over the last several years, as more of each of his customer's campaign budget has

been diverted to Facebook's supra-competitive advertising costs. As Mr. Johnson's profit margins have been decreasing, he has less resources to reinvest in the quality and innovation of his services. Mr. Johnson has been harmed by lack of transparency and obfuscated ad placement and related transaction details.

**B.   Defendant**

22.   **Defendant Facebook, Inc.** is a publicly traded corporation, incorporated under the laws of Delaware. Facebook's principal place of business and headquarters are located at 1601 Willow Road in Menlo Park, California.

23.   Founded in 2004 by Mark Zuckerberg, Facebook is a social media company that provides online services to more than 3.14 billion users. Facebook owns and operates several business divisions, such as:

- Facebook. Facebook's core social media application, which bears the company's name, is, according to Facebook's filings with shareholders, designed to enable "people to connect, share, discover, and communicate with each other on mobile devices and personal computers." The Facebook core product contains a "News Feed" that displays an algorithmically ranked series of content and advertisements individualized for each person.

- Instagram. Instagram is a social media photo-sharing application that allows users to share photos, videos, and messages on mobile devices. Facebook acquired Instagram in April 2012.

- Messenger. Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be sent from person to person across platforms and devices.

- WhatsApp. WhatsApp is a secure messaging application used by individuals and businesses. Facebook acquired WhatsApp in 2014.

24.   In exchange for providing services, Facebook collects user data, which it uses to target advertising to Facebook users. In 2019, Facebook collected 98% of its revenue ($70.7 billion) almost entirely from allowing companies to serve ads to its users.

## IV.   FACTUAL ALLEGATIONS

**A.   Overview of Social Networking, Social Media, and Digital Advertising**

25.   Facebook's constituents include (1) consumers/users who access the platform and use its services at no out of pocket monetary cost; (2) digital advertisers who pay to gain access to those users; and (3) content creators whose content is distributed on the platform and who earn ad dollars when Facebook funnels readers to them.

26.   Social media products and services include social networking, messaging, and media platforms designed to engage people by facilitating sharing, creating, and communicating content and information online. Although the boundaries of the social media market are imprecise, social media platforms generally allow users on their networks to interact with people or groups they know, display content through linear feeds, or otherwise add socially layered functionality for services online, usually through a mobile app. Social media is driven by networks, while many social media products and services include common functionalities, such as public profiles, curated feeds, followers, messaging, and other use cases. Others focus on certain aspects of public and private communications[1]

27.   Social Networks are distinguishable from Social Media. While a broad view of the social media market is useful for considering the wider landscape for social data and online advertising, it is important to focus on the actual use, demand, and substitutability of social products when examining competition among social platforms online. The critical distinction between social networking and social media markets is how people use the platform. As Germany's Federal Cartel Office (Bundeskartellamt) and the United Kingdoms Competition and Markets Authority (CMA) have noted, the specific demand for social networks "is fundamentally different from the demand for other social media."

28.   Social network platforms facilitate their users finding, interacting, and networking with other people they already know online, and by providing a "rich social experience" through features on their products. People regularly use social network platforms to exchange "experiences, opinions and contents among specific contacts which the users define based on identity."

[1] Investigation of Competition in Digital Markets, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, Majority Staff Report and Recommendations, October 2020. ("House Report")

29.    In contrast, social media platforms principally facilitate the distribution and consumption of content. Much of the content on YouTube, for example, can be enjoyed by users with a wide range of relationships to the person posting, including by strangers. Similarly, TikTok describes itself as a "global platform for users to express their ideas by sharing videos with a broader community." In light of this distinction, YouTube is focused on offering content and does not compete with Facebook, facilitating communication and sharing content among groups of friends who choose each other and enjoy content in large part because of those relationships.

30.    In sum, social networking sites have a robust social graph, whereas content-centric sites do not. Although users can share videos or stream events on Facebook and YouTube in similar ways, there is a fundamental difference between sharing a video among a person's social network on Facebook, Instagram, or WhatsApp—such as a child's first steps—and broadcasting it publicly on YouTube. While people may spend significant time on both YouTube and Facebook, these firms provide distinct services to their users, and including both in the same market would be inconsistent with how users engage with each platform.

31.    Facebook is the largest social networking platform in the world. Its business operates around five primary product offerings, including: (1) Facebook, a social network platform; (2) Instagram, a social network app for photos and videos; (3) Messenger, a cross-platform messaging app for Facebook users; (4) WhatsApp, a cross-platform messaging app; and (5) Oculus, a virtual reality gaming system. Facebook reported in July 2020 that its platform includes 1.79 billion daily active users (DAUs),[2] 2.7 billion monthly active users (MAUs),[3] and an average revenue per user (ARPU) of $7.05.[4] Last year, Facebook's businesses collected about $70 billion in revenue—a 27% increase from the prior year—earning about $24 billion in income from its operations.[5] Facebook reported that its family

---

[2] Facebook, Inc., Quarterly Report (Form 10-Q) 29 (July 31, 2020), https://investor.fb.com/financials/sec-filingsdetails/default.aspx?FilingId=14302237.
[3] *Id.*
[4] *Id.*
[5] *Id.*

of products—including Facebook, Instagram, Messenger, and WhatsApp—includes 2.47 billion daily active people (DAP),[6] 3.14 billion monthly active people (MAP), and a family average revenue per person (ARPP) of $6.10.[7]

32.     Facebook's other group of customers are advertisers who are interested in presenting online consumers with display ads that will attract them to the product or service being advertised. Facebook sells display ads and video ads. Facebook also sells advertising through its Facebook Advertising Network directly on websites.

33.     Facebook has 8 million advertisers.[8] Of those, the highest-spending 100 brands accounted for $4.2 billion in Facebook advertising – only about 6% of the platform's ad revenue in 2019.[9] According to Nicole Perrin, an analyst at eMarketer, "Facebook has an enormous number of advertiser clients…They're definitely pretty reliant on the long tail of small business advertisers."

**B.     Monetization and Advertising (Free is not free)**

34.     Antitrust concerns quality inasmuch as it does price.[10] "Free" is not a special zone where economics or antitrust do not apply. Federal antitrust statutes apply to anticompetitive conduct affecting "trade" and "commerce." The legal definition of these terms include "almost every activity from which [an] actor anticipates economic gain" whether or not money changes hands in that transaction.[11] For "trade" or "commerce" to exist, customers must exchange something of value for the "free" product that they receive, so that both parties anticipate economic gain.

35.     Facebook users exchange both attention and personal data in return for Facebook's services. Facebook is then able to monetize this attention and data through targeted advertising.

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Rishi Iyengar, Here's how big Facebook's ad business really is, CNN Business, July 1, 2020.
[10] Kristen Limarzi, Facebook is not an illegal monopoly, Law360, January 24, 2020.
[11] John M. Newman, Antitrust in Zero-Price Markets: Foundations, 164 U. PA. L. REV. 149, 160-163 (2015).

36.    In addition to quality and price, the exchange between the social network and the user must account for any barter of goods in kind. In the case of Facebook, users agree to trade their data to the platform in exchange for its services. The combination of these elements generates net consumer surplus: the consumer gains from using a high-quality social network and loses from any barter or monetary price paid. In this way the impact of Facebook use on a consumer fits neatly into the familiar antitrust concept of "quality-adjusted price." For example, a quality-adjusted price rises when the monetary price of a service stays constant while its quality falls or the amount of data required in trade increases.

37.    Facebook derives enormous economic value from the data it harvests from consumers on its platform. The recent House Report explained that "[o]nline platforms rarely charge consumers a monetary price—products appear to be 'free' *but are monetized through people's attention or with their data.*" The same House Report recognizes the monstrous monetary value that Facebook reaps from the data that it extracts from its users.

38.    In fact, Facebook itself touts the economic value of the data it harvests from consumers. For example, Facebook describes its massive advertising earnings in terms of average revenue per user ("ARPU") in its public filings. For 2019, Facebook's ARPU was over $41 per user in the United States.

**C.    <u>Facebook Has Sufficient Market Shares To Constitute Market Power, Especially Given The Social Media Industry's High Barriers To Entry</u>.**

**i.    Facebook's dominant market share**

39.    Facebook's market shares indicate it has the ability to control prices and exclude competition.

40.    By multiple measures, Facebook has dominant market share in the Social Network Market. Facebook.com has 58% share of the social network market, while the Facebook corporation—including WhatsApp, Instagram, and Facebook.com—has a 75% share of the social network market. The next largest competitor, Snapchat, has 13%.

41.   By multiple measures, Facebook has dominant market share in the Social Media Market. By its own measure, and as reflected in Facebook's internal documents, Facebook has estimated that it is "95% of all social media in the US[.]" Another measure, "engagement" is a metric that is essential to the business model because time spent is the primary driver for ads seen and thus more ad dollars earned. As illustrated below, more than 80% of the time that consumers in the United States spend using social media is spent on Facebook and Instagram.[12]



Units are average minutes per day among the entire U.S. population.

42.   Another way to think of Facebook's market share is to examine the percentage of digital ad dollars that are spent to buy advertising on Facebook. As measured by advertising revenue that is generated by social media platforms in the Social Media Market, Facebook (including Instagram) has market share of at least 85% of the Social Media Market according to eMarketer.

43.   Even if the market is expanded to all display advertisements, Facebook has a high market share of 50%, an amount larger than the entirety of what is called the "open web

---

[12] A fundamental problem with using active users to measure market share is that social media platforms do not compete for users so much as they compete for user attention. From a platform's perspective, having two users that spend three hours per day on their site is preferable to having ten users that log on once a month. The insight that social media platforms compete for user attention has given rise to new terms like "attention markets" or the "attention economy."

1  display" market, meaning ads placed on websites such as ESPN.com or Time.com, and more
2  than four times larger than the amount earned by YouTube, its next largest competitor.

3      44.   Facebook and Instagram together capture 50–60% of ad spend on video
4  advertising. Video ads serve a purpose that different than the purpose of other display ads.

5      45.   Facebook's high financial returns also indicate market power. Facebook
6  consistently earns returns of 50%, while its cost of capital is only 9%. Moreover, Facebook's
7  revenue growth appears to be outpacing its cost increases. Facebook's 10K filings for 2010
8  through 2018 show that while both its costs and revenues appear to be growing quickly,
9  revenue has grown at a greater rate than the costs, which indicates that Facebook is becoming
10  even more profitable over time not just in an absolute sense, but also when one compares its
11  revenues to its costs. Given that the vast majority of Facebook revenue consists of ad buys
12  on its social media platform, these consistently high returns and the trend toward ever greater
13  profitability indicate market power in social media.

14          ii.    **Barriers to entry: network effects make it impossible to leave**
15                  **Facebook**

16      46.   Network effects arise because social network platforms are not interoperable. In
17  order to interact with a friend on a social network, both parties must have accounts on the
18  same platform. Contrast this situation with mobile wireless where a Verizon customer can
19  call an AT&T customer and the phones interoperate. If a Verizon customer could only speak
20  with other Verizon customers, a user would care greatly about the size of Verizon's installed
21  base and whether her friends and family had AT&T or Verizon phones.

22      47.   This is the situation in social networks. Choosing a platform determines with
23  whom a user can communicate. Strong network effects make such platforms subject to a
24  phenomenon called tipping. Because users all want to belong to the platform where their
25  friends are, a market that starts out with multiple platforms will not stay that way. When one
26  platform gains a slight advantage, it becomes the platform of choice for new users because it
27  has more of their friends on it. Users who want to interoperate tend to all join the leading
28  platform, causing the market to tip.

48.   As the result of this "winner-takes-all" dynamic whereby a single market participant rapidly gains monopoly or near monopoly power, there is little competition in a market after it has tipped. Economists describe competition in this kind of market as occurring ex ante, when multiple rivals are all vying for the monopoly position. Competition is for the market, rather than in the market, other than by sufficiently differentiated competitors.

49.   A very significant reason that Facebook has market power is that a user cannot change platforms and expect to be able to stay in contact with her friends and family. Because social networks are not compatible, a user's friends and family would have to change platforms with her for her to be able to continue to see their feeds and interact on the platform. Thus, users may be upset about Facebook's invasive surveillance practices and low-quality content and wish they could move to a rival, but there realistically is nothing they can do other than leave the platform entirely.

50.   If they want to remain in touch with their friends they are forced to put up with Facebook's fake news, or exploitation of privacy, or any other increase in quality-adjusted price. Because Facebook has a near monopoly, the vast majority of the people with whom they want to exchange feeds are likely on Facebook already. The switching cost for any one user is therefore enormous. Members of a group that wish to primarily communicate with one another have lower switching costs individually, but very large coordination costs to get everyone to move at once. A single member who wishes to stay in touch on Facebook and finds multi-homing to be costly can prevent such a group move.

51.   There are similarly high barriers to entry in the digital advertising industry. The barriers to entry identified above on the user side, including cost and benefit barriers, consumer behavior barriers, and barriers created by Facebook, also inhibit competition in the digital advertising market. If competitors are unable to overcome those barriers, they will be unable to obtain a sufficient share of the attention economy to effectively compete. Facebook's network effects are an especially important barrier to entry in the digital advertising market. New entrants to the digital advertising market have difficulty attracting

new users, who are tied to Facebook by the presence of other users. Facebook is thus able to raise the quality-adjusted price of its advertising service without losing advertisers to its competitors.

52.    Facebook is also actively raising barriers to entry by limiting data interoperability and portability. APIs that facilitate the transfer of social graph data—for instance, a structured list of friends or an event history of prior interactions with other accounts—ease the process of switching between competing social media services. Thus, APIs enabling interoperability and portability mitigate strong network effects that otherwise serve as near-insurmountable barriers to entry. In recent years, Facebook has rolled back developer access to Facebook's APIs, severely hampering Facebook's interoperability with other services. For example, the deprecation of Facebook's Events API prevents users from using other applications to RSVP to events, and the deprecation of Facebook's Logins API no longer allows the use of other applications to create posts on behalf of a user. Blocking third-party access to these API endpoints prevents users from communicating across social media platforms, making the creation of competing social platforms extremely difficult.

53.    Facebook also has market power enforced by entry barriers due to the substantial amount of data the platform has collected about its users and their activities. It has many years of life events, scrolling activity, and posts from a user. It sees every time a user uses her "Facebook login" on another website, what she looks at, when she looks at it, and when or if she purchases something there. It knows the location of the user because either the Facebook app or a third-party app integrating Facebook's software tools is installed on a mobile device. This complete and detailed dataset permits Facebook to sell its ads at higher prices than they otherwise would garner.

54.    Facebook harvests vast stores of data based on users' interactions with its own platform as well as users' activities off Facebook that Facebook tracks such as location and purchases. Assuming that a new entrant would also be ad supported, no de novo entrant would have access to anywhere near the volume or quality of data that Facebook can access

1  until it reaches the same level of scale (which is difficult because of network effects etc.)

2  and privacy intrusiveness.

3      55.    Data brokers are unlikely to be able fill this data gap in such a way as to allow

4  new entrants to overcome Facebook's data advantage, for a number of reasons. The first is

5  that Facebook exerts total control of users' experience and data. Facebook knows and

6  influences the content they view and with which they engage. Facebook's complete and

7  accurate knowledge about real people gives it a tremendous advantage in attracting

8  advertisers. Facebook doesn't have to match cookies when it serves ads because Facebook

9  knows who its users are. It uses this exclusive knowledge and ability to justify supra-

10  competitive prices for ad placements.

11      **D.    Facebook Is Able To Exclude Competitors And Profitably Charge**
**Supra-Competitive Quality-Adjusted Prices For Products**

12  **Substantially Degraded In Quality, Thereby Harming Consumers**
**And Advertisers Because Of Its Market Power.**

13

14          **i.    Facebook has degraded quality with privacy violations**

15      56.    Consumers have suffered from Facebook's abuse of market power through

16  increased quality-adjusted price. As discussed above, quality and price are interdependent

17  elements of a product for which economists have developed the quality-adjusted price metric.

18  Although product quality may be difficult to define and measure, it is still a vital and widely

19  recognized component of consumer welfare. Facebook's violations of user privacy are a form

20  of quality degradation that is cognizable under the antitrust statutes.

21      57.    The erosion of privacy protections is not merely a consumer protection harm: it

22  is an antitrust harm as well. Though the current social media market contains few-to-no

23  privacy protective offerings, this is not because consumers overwhelmingly prefer privacy-

24  invasive services. Rather, Facebook's market dominance, coupled with consumer difficulty

25  of adequately pricing privacy controls, precludes it from having to compete for users on the

26  basis of privacy. Consumers have little to no real choice in the matter. Dominant firms see

27  little to no reason to compete to improve their privacy practices when users are so unlikely

28  to defect. Moreover, market interactions between social media platforms and users are not

one-time, discrete interactions but rather continuous transactions; consumers may find it difficult to adequately understand the "price" of their data and instead are biased towards under-estimating price.

58.    Facebook's expansive collection of user data extends beyond the primary platform. Facebook's third-party plugins facilitate collection of user data on external sites that allow for users to create accounts linked to their Facebook identities. Facebook's data collection raises the quality- adjusted price of these third-party sites, as users must expose more of their personal data for the same services.

59.    Consumers value their privacy, yet the underlying market conditions--namely, the absence of more privacy-protective alternatives, the difficulty of accurately assessing price during the long term "transactions" between the user and the platform, and the pervasiveness of Facebook third-party plugins--deprive Facebook users of meaningful alternatives.

60.    Consumers must engage with unreasonably long complex terms and conditions and must make several clicks to access their privacy settings. They do not understand the terms and it is unreasonable to expect them to do so. The presence of high default sharing of data by consumers is combined with a lack of effort to offer choice.  Users are forced to accept this low quality to access the platform because of Facebook's market power.

61.    Dark patterns cause consumers to pay a higher data price than they would freely choose. Even when a consumer has been able to navigate to the correct menu, they are often presented with multiple other settings, which serves to reduce the prominence of the location of the privacy settings. For example, on Facebook's Settings Page, consumers are presented with links to 20 different tabs along the left-hand margin of the page, of which 'Privacy', leading to Facebook's Privacy Settings and Tools is one. . . The effect of making navigation towards privacy settings and the selection of alternative options to the default a multi-stepped and partially obfuscated process has been described as a 'dark pattern'. By relying on the fact that consumers generally do not change default settings, platforms are able to maximize the number of consumers that will share the maximum amount of their personal information, to the benefit of the platform.

62.    Framing and communication of privacy settings in a way that takes advantage of consumers' behavioral limitations causes them to give away more data and privacy than they otherwise would and represents a lower quality of the service. When a user gives away more data than she might freely choose, that is also a worsening in the terms of barter between the user and the platform which, along with the lower quality, increases the quality-adjusted price. If that data is then used to serve unwanted advertising or otherwise interrupt the user's experience on the platforms, that causes a further reduction in the quality-adjusted price.

### ii.  Facebook degrades quality by saturating its product with ads of irrelevant and poor quality

63.    Consumers also report that online advertisements have generally become more intrusive.[13] On Facebook, ads are increasingly difficult to distinguish from organic content. Many ads are also inconvenient, forcing users to scroll down to access content they sought when they came to the platform. Facebook allows ads to auto-play and seize the users' attention. Consumers also find that ads are poorly targeted and irrelevant to their interests, further degrading their experience on the platform. Data shows that Facebook users are routinely being served ads that based on demographic information, are unlikely to be relevant to their interests.[14] The irrelevance of ads – defined as ads which they are unlikely to be informed by and whose products they are statistically unlikely to purchase – damages the quality of the user experience.

64.    Users are also targeted with content such as "PayDay" loans, discriminatory housing. User lists are sold such as "people likely to have cancer" or "high risk creditor" or "heavy drinker and spender at home".  Already highly vulnerable users are being targeted with high risk ads. These barter and quality elements to a user's transaction with Facebook

---

[13] Melanie Mohr, Ads are Becoming More Intrusive in 2019, MEDIUM, Jan. 21, 2019, https://medium.com/utopiapress/ads-are-becoming-more-intrusive-in-2019-5908d28db1e2; Mimi An, Why People
Block Ads (And What It Means for Marketers and Advertisers), HUBSPOT, https://blog.hubspot.com/marketing/whypeople-
block-ads-and-what-it-means-for-marketers-and-advertisers.
[14] *See, e.g.*, Complaint, *Integrity Message Boards v. Facebook, Inc.* (N.D. Cal. Aug 28, 2018)).

properly belong in traditional notions of consumer welfare and can be conceptually operationalized as part of quality-adjusted price.

### iii. Facebook degrades quality via a variety of cognitive and behavioral harms

65.    Facebook inflicts cognitive costs on consumers by intentionally and unintentionally making them experience thoughts and emotions that, given a choice, they would prefer not to experience; or for which, in a competitive market, they, at the very least, would prefer to be compensated. Those include, among others, emotional manipulation, and mental health problems.

66.    The quality that users experiences may also be reduced if the platform allows others to share low-quality materials—such as offensive or dangerous materials—among themselves. A user might prefer not to engage with a social media platform that makes money by serving false political ads or by providing tools such as "groups" that serve as virtual meeting rooms for conspiracy theorists and neo-Nazis. For example, marketing research shows consumers are willing to pay more for coffee labeled "fair trade" or "sustainable".[15,16]

67.    Facebook can gather, analyze, and sell information about its users and their social networks that is sufficiently detailed to permit construction of precise psychographic profiles. These allow Facebook to exploit its knowledge of the user with advertising or other content that accentuates or provokes emotions such as hate or fear. Facebook can exploit these emotions to enable advertisers to sell products they otherwise would not, e.g., makeup to depressed teenagers.

68.    As far back as 2012, Facebook conducted an experiment on 689,003 of its users, aimed at testing whether the platform is capable of influencing what emotions its users experience, based on what content they are being displayed. This capability is useful for Facebook given its business model. First, research suggests that the emotions we experience influence our engagement with content, including with ads. In particular, positive emotions

---

[15] https://www.gsb.stanford.edu/insights/jens-hainmueller-will-consumers-actually-pay-fair-trade
[16] https://www.icis.com/explore/resources/news/2019/06/04/10374331/consumers-willing-to-pay-more-for-sustainable-products-accenture.38

lead to people "sharing" content more often; while negative emotions increase clicks on pages, including ads. Second, the ability to influence users' emotions leads to more data being generated. Negative emotions like fear, anger and envy lead to people becoming more engaged, and reacting more to content than positive ones. Third, this ability can help Facebook make users spend more time on the platform.

69.   Moreover, several studies suggest that Facebook (and other social media), increase the chance of experiencing psychological problems, including depression and feelings of loneliness. Instilling such emotions in users need not be Facebook's goal, but it does constitute an unintended and tolerated negative consequence. In a competitive market, if consumers did not like this side of the platform and had a choice, they could use social media of higher quality. Hence, negative emotions experienced by Facebook's users as a side effect of using the platform constitute a lower quality of the product that could occur in a competitive market.

70.   Facebook inflicts behavioral costs on its consumers by intentionally and unintentionally making them engage in conduct that they would prefer not to undertake, given a choice, or for which they would prefer to be compensated in a competitive market. This includes both "on the spot purchases" caused by Facebook's ads; and spending more time on the platform than users would prefer to, including the possibility of addiction. Note that these costs are related, and to a certain extent depend upon the cognitive costs.

71.   Facebook deploys various methods to maintain user attention—so that it can serve more ads—using techniques that the medical literature has begun to demonstrate are potentially addictive. These studies show that Facebook's tactics affect the brain in the same manner as cocaine.

72.   The literature shows that users, especially younger users, can be harmed by this emotionally exploitative content. Industry insiders use the anodyne term, "engagement," to describe this sort of content because it causes consumers to spend more time on the platform. Thus, the business model of Facebook creates an incentive and ability to collect very detailed and intrusive information about users and exploit their emotions for profit.

73.    Because Facebook's profits stem from advertising, it has an indirect incentive to prove that advertising through its channels increases sales. A bona fide way of proving that is documenting actually increasing sales (as opposed to lying about it to the advertisers, which is a separate problem). Ads in this environment sometimes lead consumers to engage in purchases against their preferences. This last phenomenon has been theorized by economists under various labels, including "hyperbolic discounting" and "time inconsistency."

### iv.    Facebook degrades the quality of advertising services with lack of transparency in low quality advertising services

74.    Facebook has had a tense relationship with the advertising industry over the years. One of the biggest controversies came in 2016, when the company admitted it had miscalculated — and in some cases, significantly overstated — several ad metrics, including video views and the organic reach for business pages. The incident illustrated not only how little accountability Facebook has, but also Facebook's market power.

75.    In 2018, several advertisers took Facebook to task over data privacy issues following the Cambridge Analytica scandal. And as recently as this January, months before the July 2020 ad boycott, some of the world's biggest advertisers called on Facebook and other tech companies to do more to prevent ads appearing next to violent content and hate speech. But speaking out appeared to be easier than quitting the platform entirely. Despite the repeated pushback, Facebook's powerful ad machine kept rolling along.

76.    Even as Facebook confronted by far the largest advertiser boycott in its history in July 2020, the sheer number of advertisers on its platform insulated the company from financial fallout. Facebook's top advertisers (those accounting for only 6% of Facebook's revenue) had the luxury of experimenting with other media forms of advertising. But the 8 million small businesses found themselves handcuffed to Facebook for access to their customers according to eMarketer.

77.    Ad saturation in turn harms advertisers. When consumers are overwhelmed with ads, they develop ad fatigue or ad blindness. Furthermore, just as users are harmed by saturation of irrelevant ads, based on demographic data, users are also profiled in an

extremely detailed yet inaccurate way. Because users often find ads to be irrelevant to them, advertisers pay for ads that are ineffective, yet Facebook obscures these details of metrics to determine true ad effectiveness.

E.  **Facebook's sordid and willful path to dominance through anticompetitive lies and acquisitions**

78.  Facebook has been accused of acquiring or maintaining monopoly power through anticompetitive conduct based on its misrepresentations to consumers regarding data privacy, its depreciation of APIs, and its serial acquisition of nascent competitors.

79.  By hiding and falsifying quality, Facebook made competition on the merits impossible. Facebook was able to grow its base at least in part by deceiving users and others about its data policies. Facebook grew its market share in part by deploying dark patterns, skullduggery, and other misleading and fraudulent behavior regarding its data collection efforts so that it could, on one hand, placate users, and on the other, endear itself to advertisers (whose interest was targeted ads) in order to sell them valuable and expensive advertising. Users were not aware that their data was being collected in such abundance, either through deliberate design and control of privacy policies or by the flouting of such policies.

80.  Misrepresentation and ultimate degradation of privacy features on the Facebook platform is evidence of anticompetitive conduct. When Facebook was competing for consumers, it misrepresented its commitment to user privacy in order to gain and preserve market share; once it achieved market dominance, Facebook quickly dispensed with such commitments.

81.  Privacy was once a crucial form of competition. The social media industry was competitive between 2004 and 2012 and competitive forces restrained Facebook from degrading user privacy to obtain higher profits. In fact, one of Facebook's early strategies to compete with MySpace, for example, was to present itself as a privacy-centered alternative.

82.  Prior to establishing its monopoly, Facebook was held accountable for its touted concern for privacy and its deceptive privacy practices.  In 2007, for example, Facebook

rolled out Beacon, a program intended to increase ad revenue that required lower privacy standards and surveillance across sites other than Facebook. Although Facebook claimed that without a user's consent, it did not track the user's activity, that claim was shown to be false. After user outcry and the competitive pressure from other social media services like MySpace and Bebo, Facebook terminated Beacon.

83.   Similarly, in 2010 Facebook introduced social plugins. Like Beacon, social plugins enabled Facebook to collect data across partner sites. Again, Facebook maintained that the social plugins were not used to track user activity across the partner sites. However, once that claim was shown to be false and it became clear that Facebook was indeed using the social plugins to surveil users, social outcry caused Facebook to discontinue the program.

84.   By 2014, Facebook's former competitors had exited the market, and Facebook had effectively established its monopoly. Facebook proceeded to deceptively reverse privacy policies instituted from 2004 to 2012, in spite of clearly-expressed user preference for stronger privacy protections. For example, Facebook reinstituted social plugins, established unique user IDs and re-identification technology to track user activity across the web, and ignored Do Not Track settings- all while subtly eliminating the possibility for users to vote on privacy changes. Thus, Facebook's monopoly power allowed it to deteriorate user privacy in order to extract valuable user data without the risk that users would flee to more privacy-oriented competitors. Several antitrust cases have been premised on such behavior, including the FTC's antitrust case against Intel in 2009.[17]

85.   Facebook admits that privacy is one of the parameters along which social networks compete, and even submitted to the UK's CMA that it seeks to build a "privacy-focussed [sic] social platform." The privacy Facebook purports to commit itself to, however, relates to efforts to keep user data out of the hands of <u>outsiders</u>; Facebook conveniently makes no mention of the option for users to keep their information out of the hands of <u>Facebook</u>. Facebook makes very little information about data collection available to users, designs its platform so that this information is hard to find, and it takes minimal effort

---

[17] *See* Complaint in the *Matter of Intel Corp.*, Case 0610247 (F.T.C. 2009) (No. 9341); Decision and Order in the Matter of Intel Corp. No. 9341 (F.T.C. 2009)

(relative to other areas of user engagement) to ensure users understand their privacy settings. Facebook does not want its users to know how Facebook uses their own data or the value of that data.

86.    The basis of the bargain and true imbalance is evident in Facebook's exhaustive efforts to keep its user data practices obscured. Facebook has for years undertaken efforts to obscure the fact and the manner in which it has reversed its previously popular data protection policies. Facebook's deception regarding its data privacy policies likely duped users into thinking they were using a high-quality platform when the quality—due to Facebook's abandoning its protective data polices—was actually low.

87.    It also is generally understood that, despite Facebook's seismic shift from its earliest forays into advertising into its current, very profitable ad-supported business model, Facebook never has made any substantial effort to ensure that its users understand the basic bargain: a free social network in exchange for vast amounts of personal data that is sold to enable advertising. Its consistent strategy to make the basic terms of the modern transaction difficult to find and understand, especially given its early disclaimer of any intent to use personalized information to target ads, itself may have helped propel Facebook to dominance among consumers.

88.    In sum, Facebook was able to grow its base by deceiving users and others about its data policies. Now, Users cannot opt out of Facebook's ability to track users. Even if a user leaves Facebook, they are still tracked on other apps, across devices, and it is impossible to remove the detailed, granular profile Facebook has built on that individual.

89.    Facebook's deception of its users was critical to building its monopoly particularly during the time period in which Facebook was growing rapidly. Social networks are subject the "tipping" effect, as described above. A social network becomes more attractive and valuable to new users as more and more of their friends join the same network. If posting on more than one network is a hassle, eventually one network becomes so popular that the market "tips"; small networks are no longer attractive to users, and the winning

network essentially controls the whole market. In the United States, the social network market has tipped, so that virtually everyone is on Facebook.

90.   During this tipping point period, Facebook quietly began collecting user data without being fully transparent with its users or the public about what it was doing. Facebook also duped publishers into assisting in the data collection by convincing them to install plug-ins that allowed Facebook users to share the publisher content on Facebook. The plug-ins, though, also provided Facebook with a backdoor through which to spy on its users and harvest their data.

91.   US antitrust law does not condemn the possession of monopoly by itself, assuming that the monopolist attained dominance based on innovation, the merits of its product or services, or competitive acumen. However, purposefully designing privacy tools to (a) take advantage of the power of defaults; and (b) dissuade even privacy-concerned users from modifying the defaults by obfuscating the tools to modify those defaults is not the strategy of a company with a high quality product it wants users to compare in head to head competition with rivals. It is not competition on the merits, but rather disguise of a competitive weakness. By hiding the nature and extent of data it collects and monetizes and then making it difficult for users to modify the defaults, Facebook suppresses competition in quality. Users who believed that Facebook offered higher quality than in fact it did will have helped Facebook acquire its monopoly power, and currently help maintain it.

92.   Despite "consent" claims, Users are actually entirely unaware of Facebook's egregious practices. In a Pew Research study, 74% of Facebook users say they did not know that a list of their traits and interests existed until they were directed to their page as part of the study.  And once shown how the platform classifies their interests, roughly half of Facebook users (51%) said they were not comfortable that the company created such a list.

93.   Dark patterns cause consumers to pay a higher data price than they would freely choose. Framing and communication of privacy settings in a way that takes advantage of consumers' behavioral limitations causes them to give away more data and privacy than they otherwise would and represents a lower quality of the service. When a user gives away more

data than she might freely choose, that is also a worsening in the terms of barter between the user and the platform which, along with the lower quality, increases the quality-adjusted price. If that data is then used to serve unwanted advertising or otherwise interrupt the user's experience on the platforms, that causes a further reduction in the quality-adjusted price. The business model of Facebook incentivizes the collection and exploitation of consumer data that worsens the consumer experience.

94.   Facebook has a financial incentive to gather as much data about its users as it can, including everything from shopping patterns, reading and browsing habits, to location information. Facebook gathers further data about its users when they use the sign-in-with-Facebook functionality, which allows users to sign into third-party apps without having to create or remember additional passwords. Facebook also deploys tags and pixels to track user behavior on third-party websites. Surveillance extends not only to the consumer herself but to her friends. Facebook's ad targeting benefits not just from information about individual users, but also the data about its users' friends and insights derived from the nature and strength of their social connections. Facebook partners with data brokers to layer even more data on the data it gathers itself. Consumers can experience harm when they are surveilled. Only a small minority of consumers—15%—are happy to share their data in order to get targeted ads. An  even smaller proportion of consumers—9%—report trusting social media networks.

95.   As mentioned above, in 2010 Facebook introduced a feature called "social plug-ins" that ended up providing Facebook a backdoor to gather user data. Facebook would place a small bit of code on third-party sites, NYT.com, for example, that would permit readers on those sites to "like" content. Doing so activated that code to message the Facebook server, via the user's device, so that the "like" would be visible to the user's Facebook social network. Because the code initiated a message to the Facebook server via the user's device, which then served the "like" feature back to that device, the code initiated on the NYT.com site actually provided a backdoor to users' devices. Facebook used that backdoor harvest user data and even write and read tracking cookies—i.e., Facebook could now surveil anyone who "liked"

something they read on a third-party site. At the time Facebook was attempting to grow market share based on its purported superior privacy protections. Facebook assured the public repeatedly it wouldn't use plug-ins to track users or collect their data.

96.    These assurances turned out to be false, but the false assurances allowed Facebook to grow market share and power in a number of ways. First, with respect to consumers, the claims perpetuated the perception that Facebook protected their privacy, allowing Facebook to continue to grow its user base.  Second, even before the market tipped, evidence suggests that Facebook may have been privately using data to target ads while denying it publicly.

97.    For example, every time a Facebook user visited a page with a "like" button, Facebook retrieved the user's Facebook login cookies, possibly for use in its advertising business. This cheating, therefore, may have aided Facebook in selling higher-priced ads. Third, with respect to content providers, the assurances duped many of them into partnering with Facebook by installing the plug-in, thinking that Facebook never would collect or use information about their readers to compete directly with them or expropriate the value of the relationships they had built with their readers. Facebook told publishers the "like" button was to ensure distribution of their content across the Facebook platform, nothing more.

98.    Over the next years, however, a series of revelations and analyses demonstrated that Facebook in fact was collecting data through the installed plug-ins. When caught, Facebook distracted and dissembled, even going so far as to make the nonsensical assertion (through its chief technology officer) that, "We don't use them [the plugins] for tracking and they're not intended for tracking." The evidence, though, was to the contrary. The Wall Street Journal, for example, published an analysis in which it concluded that Facebook knew when a consumer accessed an article on a site that had installed the plug-in, even if the reader had not even "liked" the article and even if she were not a registered Facebook user.

99.    Facebook's strategy of building the technological capacity to collect data, while pretending it would never collect or use such data, worked to disadvantage both types of rivals, social networks and content providers, so that Facebook grew. Then the market

tipped. Facebook went public in 2012, added a billion users to its user base, and rivals exited. It was at this point in its history that Facebook updated its terms to make the "free" use of the platform conditioned on the user's granting permission to Facebook to monetize her data. The effect of this deception, with respect to consumers, was to increase demand, accelerating the network effects that otherwise might have accrued to Facebook's benefit at a later date (absent the arrival of another competitor) and causing the premature exit of rivals that were unable to match Facebook's combination of asserted privacy and targeting.

100.  The 2019 FTC complaint against Facebook describes a pattern of deception over the company's treatment of user data. According to the complaint, Facebook attempted to hide the option to disable third-party developers from accessing their data. Facebook was driven primarily by safeguarding its own revenue—at one point considering whether to remove user data access for all but companies spending large advertising sums on Facebook. Despite a public announcement on ending third-party developer user data access, Facebook surreptitiously gave developers a one-year grace period with their collected data.

### i.  Facebook's Anticompetitive Acquisitions

101. Facebook has completed a number of major acquisitions, most notably of Instagram and WhatsApp. Instagram was, at the time of acquisition, gaining traction in the social network market. Because of its popularity with young people and its large user base, Facebook may have viewed it as a potential rival. WhatsApp is principally an encoded messaging app, also with a huge user base, largely in markets outside the US. Facebook may have acquired WhatsApp to prevent any entry through that route into Facebook's sector of social media. Facebook also has acquired a number of companies and used their technology to enter new verticals, as it did when it launched Facebook Messenger. Facebook also has acquired companies that can be viewed as offering complements to the Facebook.com platform, such as game companies. And most recently, it announced its intent to acquire Giphy, a company that provides GIF access, an important input to social media that is currently available to users of rival messaging apps and social media sites.

102.  Facebook has injured competition by serially identifying and acquiring nascent competitors in order to maintain its dominant position. Research from Facebook's various public financial filings and statements reveal that Facebook acquired somewhere between 92 and 102 firms between 2003 and 2019 as illustrated below. Of those firms, between 32 and 46 of the acquired firms may be fairly characterized as competitors of Facebook. Facebook's acquisitions range widely in their product offerings, but they are most commonly in the packaged software or internet software/services industries.



103.  Facebook has both a strong incentive and ability to acquire smaller firms solely or primarily for the purpose of squashing competition in its incipiency. The "leapfrog competition" nature of the digital platforms market heavily incentivizes Facebook to take advantage of its dominant position to stifle nascent competitors. Unlike many other markets that can support multiple competitors at once, the market for digital platforms is prone to "tipping" in that it appears to be "winner-take-all" or at least "winner-take-most." Nascent competitors may therefore be one of the only real sources of competition for Facebook. As the Stigler Center notes, "[a]cquisition by a dominant platform of a much smaller and possibly

nascent firm could be very damaging to competition if, absent the acquisition, the smaller firm would develop into a major competitive threat or would lead to significant change in the nature of the market." Thus, the development of a nascent competitor into a fully-fledged competitor may pose an existential risk to Facebook. "Potential competition from very small entrants may be the most important source of competition faced by the incumbent."

104.  Eight years after Facebook's $1B acquisition of Instagram, a pattern becomes obvious.  Facebook repeatedly has purchased rivals, nascent rivals, or potential rivals, and paid significant premiums over what one would expect based on the targets' financial results. Facebook used its existing monopoly profits to buy off its nascent competition, thereby preserving those monopoly profits, rather than competing on the merits with those competitors.

105.  Instagram (2012): Facebook paid $1B just days after series B funding closed based on a valuation of $500 million. Facebook's overpayment suggests its purchase was not motivated only by Instagram's earning potential.

106.  Facebook was monitoring Instagram's growth before purchasing it in 2012. Instagram had been using Facebook's Connect (later renamed "Open Graph") API. That API was a way for apps and third-party websites (like Instagram) to interface with the Facebook website and social graph. For example, by integrating Facebook's API into a website, a Facebook user reading a news article on an enabled website could see which of her Facebook friends liked the article and could share the article on her own Facebook profile with just a click. Crucially, interfacing with Facebook was a two-way street: third-party apps and websites sent data on users back to Facebook, giving Facebook the ability to track users outside of Facebook's walled garden. It is not clear whether Facebook revealed that it had access to this real-time data in connection with the acquisition or its regulatory approval.

107.  If Instagram would have been a viable alternative, Facebook would have been forced to compete by offering a better-quality product, which may have included better privacy practices, fewer advertisements, and increased innovation. Facebook characterizes Instagram as a firm with an uncertain future, having only 30 million users and zero revenue when it was acquired by Facebook. But evidence indicates that Instagram had a high chance

of succeeding even if it had not been acquired by Facebook. Social media markets are prone to "tipping." As a result, social media sites that become successful usually experience rapid growth over a short period of time. This was the case with Instagram.

108. During the year it was acquired, Instagram's user growth rate was outpacing Facebook's growth rate in its prime. Instagram was both more popular on- and better designed for - use on mobile devices. This preceded an explosion in the use of mobile devices to access social media. By 2015, 80% of time spent on social media was done so on mobile devices. Facebook will argue that Instagram would not have been successful without its acquisition. But Instagram had several alternative sources of funding at its disposal, including a $525 million acquisition offer from Twitter.



109. Facebook in particular has a strong ability to identify nascent competitive threats, due in part to its 2013 acquisition of the mobile analytics company Onavo Mobile Ltd., a company that had developed a VPN app to hide users' IP addresses, thereby protecting them from third-party tracking. The app served as a secure channel through which all of a user's app activity flowed. Facebook bought Onavo and used its data to "assess not only how many

people had downloaded apps, but how often they used them." In a bitter piece of irony, an app downloaded by users to better protect their privacy was instead exploited by Facebook to study those very same users. The knowledge was then used by Facebook to identify and acquire high-performing companies and possible competitors. According to internal documents, Facebook used Onavo data to justify its high purchase price for messaging app WhatsApp in 2014.  Onavo data gave Facebook unique data on WhatsApp user engagement that even WhatsApp itself did not have.

110. WhatsApp (2014): At the time of the acquisition, WhatsApp had virtually no revenue stream; even today Facebook still has no successful strategy for monetizing WhatsApp, which suggests that the main purpose of the acquisition may have been exclusionary. WhatsApp has an installed base that would have significantly strengthened an entering social networking competitor.

111.  The price that Facebook paid to acquire Whatsapp - $19 Billion - demonstrates Facebook's market power and the anticompetitive effects of the acquisition. In "pay-for-delay" pharmaceutical cases, overpaying to acquire a firm has been used as evidence to show that a firm is trying to share its monopoly profits to stave off a potential competitor. The premise is that both firms are better off splitting monopoly profits rather than splitting the lower duopoly profits that would result from competition. Facebook's offer was a full $9 billion higher than Google's – indicating it may have overpaid to prevent Whatsapp from becoming a competitor.

112.  The dozens of acquisitions by Facebook over the last ten years created a pattern that supports a coherent exclusionary strategy based on  data from the app Onavo. In the chart below, the apps owned by Facebook are shaded in gray. Those that are growing fast— rising by more than 3 ranking spots in the Onavo data—are shaded in red, as is WhatsApp. The red-shaded apps are those that Facebook either acquired, attempted to acquire, or cut off from API access.

| | % US iPhone App Reach, Mar. 2013 | % Increase from Feb. 2013 | Rank | Rank Change from Feb. 2013 | Fate as of 2020 |
|---|---|---|---|---|---|
| Facebook | 72.60% | 0.6 | 1 | – | Part of Facebook |
| Instagram | 34.00% | 1.7 | 3 | – | Part of Facebook. Acquired 2012 |
| Twitter | 27.20% | 0.1 | 6 | – | Still operating as of 2020 |
| FB Messenger | 13.70% | 0.2 | 15 | – | N/A |
| Snapchat | 13.20% | 1.6 | 16 | + 4 | Facebook attempted to purchase, rebuffed |
| Pinterest | 11.30% | 0.2 | 20 | +1 | Still operating as of 2020 |
| WhatsApp | 8.60% | 0.3 | 30 | - | Part of Facebook. Acquired 2014 |
| Tumblr | 5.90% | 0.4 | 43 | + 3 | Still operating as of 2020 |
| foursquare | 5.00% | 0.2 | 57 | +1 | Still operating as of 2020 |
| Vine | 3.90% | 1.2 | 71 | + 25 | Cut off by Facebook in 2013 |
| Google + | 2.90% | -0.2 | 97 | - 4 | Failed (2019) |
| Path | 1.00% | 0.1 | 243 | + 22 | Cut off by Facebook in 2013 |

113.  As mentioned above, Facebook acquired the app Onavo in order to identify competitors who were obtaining users and traction among Facebook users. Facebook used the Onavo data to find the rivals that they would either acquire or exclude from the market by removing API functionality ("depreciating the APIs"). For example, Facebook was able to see that Snapchat saw declining usage after Facebook introduced a competing product: Instagram Stories. The strategy of purchasing and using Onavo to identify competitors before they could threaten Facebook's monopoly, and then acquiring those competitors was intentional.

114.  The Onavo data make it clear that Facebook excluded—whether by acquisition or "depreciating the APIs"—a series of nascent competitive threats. An incumbent that buys, over time, a number of small and growing competitors that were trying to compete closes off competition for the market. In a market with strong network effects, much, if not all, of

the benefit from competition occurs on those days when there is a competitor striving to overthrow the incumbent, and both companies improve quality and innovation.

115. On May 15, 2020 Facebook announced its acquisition of Giphy—a company that makes a library of GIFs available to users of various communications platforms— and incorporate it into Instagram.  Immediately, tech observers raised the concern that Facebook might transform Giphy, which historically has teamed up with many competing communication platforms, into yet another data-harvesting arm of the Facebook family. Facebook's pattern of past acquisitions suggests that connectivity to the Giphy product would be an anticompetitive lever. The acquisition would give Facebook the ability to deny interoperability with Giphy to its rivals or require unfavorable terms such as sharing data with Facebook. A significant swath of messaging apps, all of which could be viewed as competing at some level with the messaging functions of Facebook, Instagram, and, of course WhatsApp, currently interoperate with Giphy. Post-acquisition, Facebook could simply deny access to the Giphy library to any of its perceived rivals in an effort to lower the quality of its rivals or raise their costs of service. Such a disadvantage would steer those apps' users to Facebook's own family of services.

**F.     Facebook Maintains Its Digital Advertising Monopoly with Harmful Anticompetitive Conduct**

116.  Facebook's market power allows it to charge supra-competitive prices for its ad inventory. Facebook has the ability to charge high prices not just because it owns such a large percentage of display inventory, but also because it has extracted such extraordinary amounts of data from its often-unwitting users which make the ads more valuable.

117.  Facebook represents that an advertiser's daily spend budget, as it is set in the ad purchase portal, determines which users within the target audience will see the ad and when. But there is no transparency into Facebook's auction algorithm. There is no option for advertisers to precisely control how much money is spent each day. They can only set a maximum that may be spent each day. It is within Facebook's algorithmic discretion not to promote any of the advertiser's campaign materials into users' feeds on a particular day. More crucially, there is no ability for the advertiser to understand, from Facebook, how their purchased service – ad targeting – is delivering the promised views and clicks

118.  Facebook controls, in addition to its vast stores of user data, all information related to ads placed on its inventory, including click-through and conversion rates and the like. Advertisers, despite purchasing ads on Facebook, cannot get Facebook to give them this data, even though Facebook does provide log-level data about ads placed on other properties. This makes it difficult for advertisers to evaluate the actual value of what they are buying. An ad served on a page opened by a bot, for example, does the advertiser no good, nor does an ad at the bottom of a page that is never viewed by the user, nor an ad that runs too fast for the human eye to see. But the advertiser does not know how frequently that happens because Facebook refused to share data that permits truly independent third-party audits. This practice is only possible due to Facebook's market power and represents a decrease in the quality of the ad the advertiser buys.

119.  The harms from Facebook's anticompetitive conduct include harm to advertisers in the form of higher prices and lower quality. These reduce the advertisers' incentive to invest and innovate, which harms them and consumers. Further harm to consumers comes from the higher prices that flow through to goods and services from the higher prices of impressions, clicks, and actions that are marginal costs of obtaining sales.

120.  There is evidence that Facebook does not deliver the targeting views and clicks it promises. Several lawsuits have been filed alleging that Facebook does not deliver on its promises to effectively target ads. In one lawsuit, the plaintiff conducted a survey of over 2600 small businesses and found that Facebook was regularly showing advertisements to users who were outside the targeted demographic. As much as 40% of the ads which these firms paid for were shown to users who did not match the particular characteristics the firms had specified in their initial ad purchases made through Facebook's own Ads Manager portal.

121.  Facebook also charges high fees to its advertisers for its opaque and poorly targeted ad services. The average fee charged by a platform for ad placement is estimated at 18% of the total ad spend – for every $100 spent on an advertising campaign, the platform service will retain $18. But for small advertisers, Facebook retains 27% of ad spend on average. Advertisers may pass on these costs in the form of higher prices to consumers. Though Facebook's rent-seeking may only increase consumer prices marginally for each individual consumer, in the aggregate, the downstream price increase resulting from high ad prices and ineffective targeting is large.

122.  The effect of Facebook's artificially high prices charged to advertisers is not limited to higher prices downstream. By charging high prices to other firms seeking to advertise on its platform, Facebook is indirectly harming the ability of those firms to put resources towards improving their products and engaging in innovative development. Each extra dollar spent on an advertisement impression is a dollar which the advertising business could have spent elsewhere to promote or improve its business. This represents a significant market inefficiency resulting from the Facebook monopoly.

123.  By sinking unnecessary money into Facebook advertising campaigns which are less effective than the platform claims, firms are not dedicating the time and resources to improving their core product in a way that would optimize consumer benefit. A theory of innovation harms that only accounts for Facebook's effects on the advertising market, and not its effect on the consumer economy more broadly, leaves out a large part of the platform's detrimental effects on the consumer experience.

124.  Lack of transparency for advertisers is both a harm and a manifestation of market power. The quality of an advertising service includes the ability to verify that the ad was shown as promised. For there to be effective competition between suppliers of advertising inventory, advertisers need to be able to make informed choices about the inventory that they buy. Effective competition between intermediaries relies on both advertisers and publishers being able to make informed decisions on the channels through which they buy and sell.

125.  Platforms and intermediaries may have the incentive and ability to exploit the asymmetries of information and inertia on the part of advertisers in a number of ways. For instance, platforms with market power can take steps to reduce the degree of transparency in digital advertising markets, or refrain from taking steps to make it transparent, forcing advertisers to rely on information and metrics provided by those platforms.

126.  Additionally, advertisers suffer from lower-quality advertising outcomes than they would in a competitive market. Advertisers expressed concern over restrictions on third-party verification, which can lead to overcharges above and beyond the otherwise supra-competitive price. Facebook in 2016, for example, admitted that it had substantially over-reported view time for video ads, leading to improper overcharges. Advertisers would have had no way to learn about this overcharge had Facebook not disclosed it itself.

127.  The lack of transparency in advertising on Facebook also exposes advertiser's ads to dangerous content and harms the brand. Because Facebook controls the data reflecting the placement and performance of ads and does not fully share it with advertisers, advertisers lack the ability to audit or understand where their ads are appearing. It has been reported, for example, that internet trolls utilize the group feature to form closed "banter groups," specifically for the purpose of exchanging distasteful memes and jokes on topics such as rape and child sexual abuse. Facebook places ads in group feeds, presumably including in groups feeds where few if any advertisers hope to find their next customer. This dangerous content appearing next to an ad for a known brand, e.g. Pampers or Starbucks, harms the reputation of those brands. This is known as "brand safety" and is a critical element of quality from the

point of view of an advertiser.

128.  Digital ads are sometimes not delivered at all, displayed on a part of the page that the consumer never scrolls to, or shown too quickly for the human eye to see. Such ads are obviously not delivering value to the advertiser. Facebook has the incentive and ability to overstate the quality and effectiveness of their advertising inventory, for example, or to increase prices. To the extent such instances are common, they raise the price per effective ad that the advertiser is paying.  Advertisers therefore prefer to audit the performance of the platform and there are a set of independent tools to help them do that.

129. Facebook does work with a number of 'approved' third-party verification providers, however they restrict access to detailed consumer level. Other display advertising platforms in contrast reported that they do allow advertisers to use tracking tags for third-party verification of impressions served on their advertising inventory.

130.  Denying audit and verification raises the quality-adjusted price of the ad and is an exercise of market power. An additional quality element of advertising is brand safety, which is the appearance of the brand next to dangerous or unsuitable content. Facebook prevents brands from having full ability to audit or verify brand safety. Without access to the underlying raw data and the ability to have full independent verification, there was a perception on the part of advertisers and agencies that Facebook was in effect 'grading their own homework' in respect of the effectiveness of their own advertising inventory.

## G.    Government Investigations and Actions Regarding Facebook's Monopolistic Activities

131. Facebook is currently facing four separate antitrust investigations by the Department of Justice, the Federal Trade Commission, a group of state attorneys general, and the House Judiciary Committee.

132.  In September 2019, the United States Department of Justice announced that it had opened an investigation into whether Facebook is committing illegal monopolistic acts. The DOJ stated that its probe would focus on whether and how Facebook and other leading online platforms "have achieved market power and are engaging in practices that have

reduced competition, stifled innovation, or otherwise harmed consumers."

133. On July 29, 2020, the House Subcommittee on Antitrust, Commercial, and Administrative Law of the House Judiciary Committee held hearings on the subject of "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google."  Facebook CEO Mark Zuckerberg appeared for questioning by members of Congress, including regarding whether Facebook has abused its position as the default social med.  The Subcommittee Chair, Rep. David N. Cicilline (D-RI), noted the "harmful economic effects" of the market dominance of Facebook and the other companies under scrutiny for monopoly conduct: "They discourage entrepreneurship, destroy jobs, hike costs, and degrade quality."

134. On October 6, 2020, the House Subcommittee issued a report entitled "Investigation of Competition in Digital Markets."  The report finds that,

135.  In addition to the House Subcommittee's investigation of Facebook's monopoly power, state and federal antitrust authorities are investigating Facebook for potential violations of the U.S. antitrust laws. In July 2019, Facebook disclosed that the Federal Trade Commission (FTC) had opened an antitrust investigation of Facebook in June 2019.  In September 2019, New York Attorney General Letitia James announced that she joined with eight other attorneys general to lead a multistate investigation of Facebook, Inc.  In October 2019, Attorney General James reported that the investigation into Facebook grew to include 47 attorneys general.

136.  Several antitrust enforcement agencies have examined Facebook's monopoly in recent years and reached similar conclusions. In July 2020, the United Kingdom's Competition and Markets Authority (CMA) found that Facebook is dominant in the markets for social networks and digital display ads, and that its market power "derives in large part from strong network effects stemming from its large network of connected users and the limited interoperability it allows to other social media platforms." In July 2019, Germany's Federal Cartel Office (Bundeskartellamt) found that "Facebook is the dominant company in the market for social networks," and that in Germany's social network market, "Facebook

achieves a user-based market share of more than 90%." And in June 2019, the Australian Competition & Consumer Commission (ACCC) found that "Facebook has substantial market power in a number of markets and that this market power is unlikely to erode in the short to medium terms."

137. In June 2020, Germany's antimonopoly regulator ordered Facebook to allow people to block the company from combining their Facebook data with information about their activities on other apps and websites. According to the regulator, Facebook unfairly used its dominance to collect data about millions of users of third-party sites that used tools like Facebook's "like" and "share" buttons, and an analytics service called Facebook Pixel. Regulators concluded that consumers faced a false choice: Agree to hand over vast amounts of personal data or not use Facebook's ubiquitous social media services at all.

## V.   INTERSTATE TRADE AND COMMERCE

138. Facebook's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

139. At all material times, Facebook has provided a social media network and platform and has exchanged consumer information and attention with advertisers and consumers, and participated in the marketing, promotion, distribution, and sale of advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

140. Facebook has used instrumentalities of interstate commerce to provide social media and digital advertising services to consumers and advertisers throughout the United States.

141. In furtherance of the anticompetitive scheme alleged herein, Facebook has traveled between states and exchanged communications through interstate wire communications and via the Unites States mail; and

142. The anticompetitive scheme alleged herein has affected billions of dollars of commerce. Facebook has inflicted antitrust injury by artificially raising the cost to consumers of using its platform, in terms of personal information and attention, by providing reduced

user privacy protections to consumers in exchange for their personal data, and by artificially reducing consumer choice and competition in the Social Media Market, and by artificially raising prices in digital advertising in the United States

143.  Facebook's conduct also had substantial intrastate effects in that, among other things, Facebook's social networking and advertising services for display advertisements were sold in each state, including California.   At least thousands of individuals in each state, including California, were impacted by Facebook's anticompetitive conduct.   As alleged below, absent Facebook's unlawful conduct, Plaintiffs and class members within each state would have paid less or received greater profits for social media and/or digital advertising services.

## VI.   RELEVANT MARKET

144.  In a transaction market, in both user groups come to the platform with the intent to transact with one-another. A non-transaction market is one in which one user group does not come to the platform with the intent to transact with the other user group. Facebook is a non-transaction platform because Facebook users do not come to the platform with the purpose of transacting with advertisers. Rather, they access Facebook to interact with other users. Facebook is also an audience providing platform because its business model revolves around providing advertisers with the attention of its users. Advertisers benefit from an increase in the number of users, but users generally do not experience the same benefit from an increase in the number of advertisers.

145.  There are two relevant markets applicable to this dispute. They are: (1) "the Social Network Market"; and (2) "the Social Media Market." Facebook has unlawfully acquired and maintained monopoly power in both markets.

**Online Social Networks Are an Antitrust Market**

146.  The relevant geographic market is the United States. Market participants recognize this in the ordinary course of business. Social network platforms each provide services to consumers throughout the United States, and these services do not differ by geographic area within the United States

---

147.  Communication-focused social networks form a relevant antitrust market that is distinct from other social media. There is a specific demand for social networks (such as Facebook), which is fundamentally different from the demand for social media. Consistent with social media platforms' differentiated strategies, consumers access different platforms for different reasons. For example, a platform that is oriented more towards communication may be more commonly accessed by consumers to have conversations with friends than a platform oriented more towards content. Social media platforms compete more closely (on the consumer side) if they are generally accessed by consumers for similar reasons. Facebook's platforms will therefore likely face the greatest constraint from platforms accessed by consumers for broadly similar reasons.

148.  Social media platforms differentiate themselves from one another in various ways. YouTube and TikTok principally facilitate the distribution and consumption of content. In particular, much of the content on YouTube can be enjoyed by users with a wide range of relationships to the person posting, including complete strangers. YouTube is focused on offering content and does not compete with Facebook. Other platforms, including Facebook, primarily facilitate communication (including the sharing of third-party content) among groups of friends who choose each other and enjoy content in large part because of those relationships. Facebook is a prime example of this second category of social media platforms.

149.  The key purpose of social networks is finding and networking with people the users already know, and to exchange on a daily basis experiences, opinions and contents among specific contacts which the users define based on identity. Providers meet this demand by offering the corresponding core functionalities which grant users a 'rich user experience.

150.  A principal distinguishing feature for Facebook is the "social graph". A social graph is a virtual map of the vast web of connections between users that allows a platform to suggest new friends, display content liked by friends, and gather and create data based not just on a particular user's activity on the platform, but also that of her friends. Facebook.com has a robust social graph; YouTube does not.

1      151.  The strongest reason to conclude that communication-focused social networks

2  occupy their own antitrust market is that consumers themselves see such platforms, such as

3  Facebook.com, as fulfilling a wholly different function than do the content-focused

4  platforms such as YouTube. Internal Google documents that concluded the most common

5  reasons consumers access YouTube are (1) to view third-party entertainment; or (2) to view

6  "how-to" videos. Consumers generally access Facebook.com for entirely different reasons,

7  such as learning about the lives and events of friends and family. Facebook.com and

8  YouTube do not appear to compete directly and are in separate markets. For example, few

9  consumers could find equivalent services from YouTube if the quality of Facebook.com were

10  to decline and they wanted to leave the platform. By contrast, the Facebook family of

11  platforms, led of course by Facebook.com, operates as a single competitive unit.

12      152.  Search engines, such as Google, Yahoo, or Bing, are not "social networks"

13  because they do not provide for interaction between platform members. Similarly, apps like

14  Apple's "iMessage," which simply allow the sharing of messaging media, such as emails or

15  text messages, are not social networks because, although they provide for interaction, they

16  do so only in a device-to-device manner and focus solely on delivering messages rather than

17  facilitating a broader online social experience. Facebook itself has noted this distinction,

18  explaining in documents provided to the House Antitrust Subcommittee that whereas the

19  growth of Apple's iMessage is "limited by the adoption of iPhones, . . . Facebook's products

20  can be used across devices."

21      153.  Social media platforms constitute a market for antitrust purposes. Defining a

22  product market typically is one of the first steps in any antitrust analysis. The goal is to

23  demarcate the boundary between products or services that can be substituted for one

24  another, on one hand, and those that cannot, on the other.

25      154.  Still other types of online networks, such as LinkedIn, are not "social networks,"

26  as that term is defined in this complaint, because they are used for a different purpose, and

27  are used in parallel to—rather than instead of—Social Networks. Whereas LinkedIn is

28  typically considered the dominant professional social network in the world, it is not a

replacement for Facebook. This is because LinkedIn is used primarily for professional networking and employment-seeking purposes, while Facebook and its like are used primarily for non-professional, personal purposes. The European Commission explained this distinction during its review of the Microsoft/LinkedIn merger: "the reasons for using a [professional service network] are different from those for using a personal social network. While the former is used to '1. Maintain professional identity, 2. Make useful contacts, 3. Search for opportunities, 4. Stay in touch', the latter is used to '1. Socialize, 2. Stay in touch, 3. Be entertained, 4. Kill time'."

155. Thus, users will have both a LinkedIn and Facebook account, not one or the other, and this other type of network is not viewed or treated as a substitute for a Social Network.

156. Users don't 'multi-home' such that Facebook has any real competition. Although virtually all visitors to other social network sites also visit Facebook.com, the reverse is not true. For example, 97% of Instagram's users "cross-visit" with Facebook.com, but only 66% of Facebook.com users cross-visit with Instagram. 95% of Snapchat users cross-visit with Facebook.com, but only 68% of Facebook.com users cross-visit with Snapchat. The implications of this pattern are at least two-fold. First, asymmetric multi-homing patterns confirm that Facebook.com is used more than any of its competitors, and therefore is likely to have market power. Second, even the competitor whose users were the least likely to use Facebook.com—TikTok—has a high proportion of users who cross-visit with Facebook.com. 70% of TikTok users (who skew young) also use Facebook.com, suggesting that users even of TikTok, the new kid on the block, do not view this platform as a substitute

1  for Facebook.com.



**Facebook, YouTube continue to be the most widely used online platforms among U.S. adults**

*% of U.S. adults who say they ever use the following online platforms or messaging apps online or on their cellphone*

YouTube 73%
Facebook 69
Instagram 37
Pinterest 28
LinkedIn 27
Snapchat 24
Twitter 22
WhatsApp 20
Reddit 11

Note: Pre-2018 telephone poll data is not available for YouTube, Snapchat and WhatsApp. Comparable trend data is not available for Reddit.
Source: Survey conducted Jan. 8-Feb. 7, 2019.
PEW RESEARCH CENTER

157.  There are no reasonable substitutes for Social Networks. Social Media platforms, such as YouTube and TikTok, primarily exist to allow users to stream, share, and view content. By contrast, firms in the Social Network Market provide users of a particular network an online community that brings together users who specifically choose to associate with one another. In addition, Social Networks, such as Facebook, provide a "rich social experience" to users through specific product features. Social Media platforms, like YouTube and TikTok, do not provide or facilitate a similar use and instead offer only limited opportunities for social interaction, or interaction of a very different type that complements, rather than substitutes, for a social networking experience.

158. Beyond the "rich social experience" that Social Networks provide to users, consumers also use Social Networks for different purposes than other online social options, such as Social Media platforms. The House Antitrust Subcommittee, Germany's Federal Cartel Office, and the United Kingdom's Competition and Markets Authority have all recognized that "the specific demand for social networks is fundamentally different from the

demand for other social media." That is because users utilize each for different purposes: Social Networks "facilitate their users finding, interacting, and networking with other people they already know online," whereas Social Media platforms "principally facilitate the distribution and consumption of content" between "users with a wide range of relationships to the person posting, including by strangers." Thus, while a user might use YouTube to access and watch a complete stranger's video—such as a cooking recipe—the same user would use Facebook, not YouTube, to share *that* video with the user's friends, family, and real-world connections. Similarly, a user that finds a funny video of a celebrity (or other stranger) on YouTube may choose to encourage their friends and family to view that video by sharing it with them on Facebook with a note.

## The Social Media Market is an Antitrust Market

159. The relevant geographic market is the United States.  Market participants recognize this in the ordinary course of business. Social media platforms each provide services to consumers throughout the United States, and these services do not differ by geographic area within the United States.

160. No other social media platform is a substitute for Facebook because each potential competitor provides a much narrower service that competes with only one element of Facebook's broader portfolio of services. Consumer cross-visiting behavior confirms the lack of substitutability between Facebook and other social media sites. For example, over 90% of Snapchat users also access Facebook, indicating that Facebook has functionality that consumers cannot find on Snapchat.

## Digital Display Advertising is an Antitrust Market

161. There are two principal forms of digital advertising: search advertising and display advertising. Search advertising refers to digital ads on desktop or mobile search engines, such as the Google.com homepage, displayed via "search ad tech" alongside search engine results. Search advertising is often bought and sold via real-time bidding (RTB) auctions among advertisers, where advertisers set the prices that they are willing to pay for a specific keyword in a query. Display advertising refers to the delivery of digital ad content to

ad space on websites and mobile apps, which is referred to as "inventory." Like search advertising, buying and selling display ads often involves real-time bidding

162. Facebook has monopoly power in online advertising in the social networking market. Notwithstanding Google's dominance, Facebook also has a significant share of revenue and growth in online advertising with many market participants referring to them as duopolies in this broad market.

163. Market participants interviewed by the Subcommittee consider Facebook "unavoidable" or "must have" due to the reach and scale of its platform. In particular, some businesses consider Facebook's identity product—its ability to persistently track users' online and offline conduct to serve tailored ads—as a unique feature.

164. As David Hansson, the Chief Technology Officer and Cofounder of Basecamp, explained in his testimony during the House Subcommittee's fifth hearing, the nature of Facebook's targeted advertising makes it difficult to replace: "At Basecamp, we ultimately ended up swearing off the use of targeted advertisement based on the exploitation of personal data. Facebook's record of protecting privacy, and gathering their consent in the exploitation of their data for advertisement purposes, is atrocious, and we decided that we wanted no part of it. But choosing to opt out of targeted advertisement on the internet is like competing with one arm behind your back. It is very clear why most companies feel compelled to do this kind of advertisement, even if it's a violation of their ethics. If their competitors are doing it, they're at a significant disadvantage if they don't. And the same is true for us. We have undoubtedly given up growth to competitors because we've refrained from pursuing targeted ads."

## VII. ANTITRUST IMPACT

165. Facebook users agree to trade their data to the platform in exchange for its services. Impact to consumers fits into the anti-trust concept of quality adjusted price. A quality-adjusted price rises when the monetary price of a service stays constant while its quality falls or the amount of data required in trade increases.

CLASS ACTION COMPLAINT, Case No. 5:20-cv-8721
46

166.  Fair and vigorous competition would make Facebook's services better than if it can shelter itself from competitive forces. Economic theory tells us that new entry or even the threat of new entry forces incumbents to innovate and improve quality, which increases consumer welfare. Rival services could compete against Facebook by continuing to offer a service for free, while simply extracting less data or using the data it does extract in less invasive ways, if users were aware of this quality-adjusted price discount and responded to it.

167.  Facebook has chosen not to compete on the merits of its products and services and instead has misled, deceived, and exploited consumers and publishers. Facebook fought for at least a decade to avoid competition on the merits in the social networks market. Facebook has engaged in a long-term, integrated, anticompetitive strategy of half-truths about its privacy policies, exclusionary API manipulation, and anticompetitive acquisitions of nascent competitors that led to its current dominance of a market in which it now wields significant power over consumers, advertisers, and publishers. The methods used by Facebook to achieve monopoly violated US antitrust law and harms consumer welfare.

168.  In sum, the marked decrease in competition that has resulted from Facebook's conduct has caused economic injury to Plaintiffs and class members because users and advertisers have paid more than they otherwise would have paid.

## VIII. TOLLING OF THE STATUTE OF LIMITATIONS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

169.  Plaintiffs and class members had no knowledge of Facebook's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

170.  As described herein, Plaintiffs and class members suffered antitrust injury in the form of economic losses as a result of Facebook's wrongful exercise of monopoly power in the relevant market.  Other than dealing directly with Facebook when using its digital advertising services, Plaintiffs had no direct contact or interaction with Facebook and no means from which they could have discovered these injuries and the other bases for their

1  causes of action set forth in this complaint.

2  171. Throughout the class period, and continuing thereafter, there was no

3  information in the public domain sufficient to put Plaintiffs on notice that Facebook had

4  wrongfully acquired a social networking and digital advertising monopoly or was using its

5  monopoly power to charge advertisers supra-competitive prices for display advertising and

6  to charge supra-competitive quality adjusted prices to users.

7  172. It was reasonable for Plaintiffs and class members not to suspect that Facebook

8  was engaging in any unlawful and injurious anticompetitive behavior.

9  173. While certain of Facebook's anticompetitive acts occurred before the applicable

10  limitations periods, not until recently, with the announcement of governmental investigations

11  into Facebook's monopolization of the market for social networking services and display

12  advertising markets, could Plaintiffs have discovered their antitrust injuries and causes of

13  action set forth in this complaint.  At the time it occurred, no reasonable class member had

14  any basis to discern the anticompetitive purpose and effect of Facebook's conduct described

15  in this complaint that occurred before the applicable limitations periods.

16  174. Plaintiffs allege a continuing course of unlawful conduct by Facebook, including

17  conduct within the applicable limitations periods.  That conduct has inflicted continuing and

18  accumulating harm to Plaintiffs and class members within the applicable statutes of

19  limitations.

20  175. For these reasons, the statutes of limitations applicable to Plaintiffs' and class

21  members' claims have been tolled with respect to the claims asserted herein.

22  **B.  Facebook's Fraudulent Concealment Tolled the Statute of Limitations**

23  176. Additionally, or alternatively, application of the doctrine of fraudulent

24  concealment tolled the statutes of limitations on Plaintiffs' claims.  Plaintiffs had no

25  knowledge of Facebook's wrongful acquisition and maintenance of monopoly power in the

26  relevant market, or of facts sufficient to place them on inquiry notice of their injuries or the

27  other bases for their causes of action, during the class period and continuing thereafter.  No

28  information in the public domain or otherwise available to Plaintiffs during the class period

1  suggested that Facebook had wrongfully acquired a digital advertising monopoly or was using

2  its monopoly power to charge advertisers supra-competitive prices for display advertising

3  and to pay sub-competitive prices to publishers of such advertising.

4      177.  Facebook concealed its illicit and harmful conduct, both by failing to disclose its

5  wrongful acquisition and maintenance of a social networking, social media, and digital

6  advertising monopoly through exclusionary acts in the relevant market, and by affirmatively

7  denying that it was engaged in such conduct.  Facebook has (repeatedly) publicly denied

8  allegations by American and foreign regulators that it has abused its power in social

9  networking markets.  These affirmative statements, and Facebook's nondisclosure that it had

10  acted to forestall competition, served to fraudulently conceal Facebook's unlawful monopoly

11  in brokering online display advertising.

12      178.  In addition to its affirmative fraud and nondisclosure, Facebook's

13  anticompetitive conduct also was inherently self-concealing because revealing the true facts

14  concerning Facebook's monopolistic behavior would have prompted governmental

15  enforcement activity and/or class action litigation.  Digital advertising is subject to antitrust

16  regulation, so it was reasonable for Plaintiffs and class members not to suspect that digital

17  advertising services were being sold in a noncompetitive market.  A reasonable person under

18  the circumstances would not have had occasion to suspect Facebook was engaging in

19  extensive surveillance of consumers, manipulating and exploiting its users, and selling display

20  advertising at supra-competitive prices at any time during the class period.

21      179.  Because Facebook's antitrust violations were self-concealing and affirmatively

22  concealed by Facebook, Plaintiffs and class members had no knowledge of Facebook's

23  antitrust violations or of any facts or information that would have caused a reasonably diligent

24  person to suspect Facebook of having wrongfully acquired and maintained monopoly power

25  during the class period.

26      180.  Therefore, by operation of Facebook's fraudulent concealment, the statutes of

27  limitations applicable to Plaintiffs' and class members' claims were tolled throughout the class

28  period.

## IX. CLASS ACTION ALLEGATIONS

181.  Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of the following Classes:

a)  **Antitrust Facebook User Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.

b)  **Unjust Enrichment Class:** All persons or entities in the United States who maintained a Facebook profile at any point from 2007 up to the date of the filing of this action.

c)  **Antitrust Facebook Advertiser Class:** All persons and entities in the United States who, from January 1, 2014 to the present, directly paid Facebook for advertising services.

d)  **Antitrust Facebook Marketer Issue Subclass:** All persons and entities in the United States that, from January 1, 2014 to the present, directly paid Facebook for advertising services as an intermediary for marketing campaign purposes

182.  Excluded from the proposed Class are: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

183.  The proposed Class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).

184.  Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses, or modified in any other way.

185.  The members of the Class are so numerous that joinder is impracticable.  The Class includes at least hundreds of thousands of members that are widely dispersed

1  throughout the country.

2      186.  Plaintiffs' claims are typical of the claims of all Class members.  Plaintiffs' claims

3  arise out of a common course of conduct that gives rise to the claims of all other Class

4  members.  Plaintiffs and all Class members were and will continue to be damaged in the same

5  manner by the same wrongful conduct, namely Facebook's unfair business practices and

6  monopolization of the market for display advertising services.

7      187.  Plaintiffs will fairly and adequately protect and represent the interests of the

8  Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.

9      188.  Plaintiffs are represented by counsel who are experienced and competent in the

10  prosecution of class action litigation and have particular expertise with antitrust litigation.

11      189.  Numerous questions of law or fact common to the class arise from Facebook's

12  course of conduct to exclude competition in the relevant market, including:

13          a.      Whether Facebook's deception of consumers about its data

14  privacy practices was anti-competitive;

15          b.      Whether Facebook intentionally made material misrepresentations

16  about its data privacy practices and the extent of its commercial surveillance;

17          c.      Whether Facebook holds monopoly power in the Social

18  Networking Market;

19          d.      Whether Facebook holds monopoly power in the Social Media

20  Market;

21          e.      Whether Facebook holds monopoly power in the Digital

22  Advertising Market;

23          f.      Whether Facebook unlawfully acquired and maintained monopoly

24  power in the relevant markets;

25          g.      Whether Facebook engaged in unfair business practices that

26  reduced competition and caused harm in the relevant markets;

27          h.      The form and content of injunctive relief to restore competition;

28  and

          i.      The amount of damages owed the class as a result of Facebook's illegal

activity.

190.  Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Facebook acted on grounds generally applicable to the class as a whole.  For the same reason, class certification for purposes of adjudicating Plaintiffs' claims for injunctive and declaratory relief is appropriate.

191.  This class action is superior to other alternatives for the fair and efficient adjudication of this controversy.  Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

192.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Facebook.

193.  Plaintiffs reserve the right to seek class certification with respect to common issues, including issues related to Facebook's duties or conduct.

## X. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT
### 15 U.S.C. § 2

#### (On Behalf of Plaintiffs and all Classes)

194.  Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

195.  The market for social networking services in the United States is a relevant antitrust market, and Facebook has monopoly power in that market.

196.  The market for social media services in the United States is a relevant antitrust market, and Facebook has monopoly power in that market.

197.  The market for social media display advertising services in the United States is a relevant antitrust market, and Facebook has monopoly power in that market.

198.  Facebook wrongfully acquired and unlawfully maintained monopoly power in

the relevant market through the overall scheme and conduct alleged herein, including by deception and misrepresentation regarding privacy practices, acquiring rivals, denying interoperability on several technological fronts, and restricting competing firms' access to information.

199.  Facebook's actions were carried out willfully and with the specific intent to acquire and maintain monopoly power in the relevant market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

200.  Facebook's exclusionary conduct has foreclosed a substantial share of the market for social networking, social media, and display advertising services.

201.  As a direct and proximate cause of Facebook's conduct, Plaintiffs and members of their respective Class have suffered antitrust injury in the form of extreme invasions of privacy, degradation of personal data, and economic losses.  Those losses constitute antitrust injury, as they are an injury of the type the antitrust laws were intended to prevent and that flows from what makes Facebook's monopolistic acts unlawful.  But for Facebook's unlawful deceptive and exclusionary conduct, competition would have prevailed in the relevant market and Plaintiffs and Class members would not have sustained these losses.  Facebook's conduct also deprived Plaintiffs and Class members of improved quality and innovation in the relevant markets.

202.  There is no legitimate pro-competitive justification for Facebook's anticompetitive conduct, and even if there were, less restrictive alternatives to achieve it would exist.

203.  Plaintiffs and members of the Class are entitled to equitable relief as appropriate to halt Facebook's monopoly conduct and restore competition in the relevant market. Members of the Classes are regular users Facebook's services or purchasers of digital advertising services and will continue to use and purchase such services and suffer further injury if Facebook's monopoly is not ended.  The primary purpose of such injunctive relief will be to benefit the public from the lower quality-adjusted and monetary prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Facebook's monopoly.

204. Plaintiffs and members of the Class are entitled to damages, including treble damages, sustained as a result of Facebook's monopolistic acts and practices.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)**
**(On Behalf of Plaintiffs and all Classes)**

205. Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

206. Facebook's conduct is unlawful in violation of the UCL because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

207. Facebook has engaged in unfair business practices through the overall scheme and conduct alleged herein, which has restrained competition. Facebook's conduct is unfair, in violation of the UCL, because it violates California's clearly established public policy forbidding monopolistic acts. Facebook wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the conduct alleged herein, including by deception and misrepresentation regarding privacy practices, acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information.

208. Facebook's practices also are unfair in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including from Facebook's supra-competitive quality-adjusted prices that users paid and supra-competitive prices that advertisers paid, that outweighs by a wide margin any possible utility from the practices.

209. Facebook's unlawful and unfair business practices actually and proximately caused Plaintiffs and class members to lose money or property.

210. Plaintiffs and Class members lack an adequate remedy at law to redress certain conduct of Facebook that violates the unfair prong of the UCL. Through the practices described herein, Facebook suppressed competition in its incipiency, violated well-established antitrust policies, and significantly harmed and threatened competition in the relevant market.

211.  Accordingly, on behalf of the Class, Plaintiffs seek injunctive relief, restitution, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper. The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Facebook's monopoly.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment/Quasi-Contract**
**(On Behalf of Plaintiffs and all Classes)**

212.  Plaintiffs incorporate the foregoing allegations as if fully set forth herein

213.  Plaintiffs and Class members conferred direct benefits on Facebook in the forms of their personal data, time, and attention.

214.  These benefits are quantifiable in measurable units. Facebook sells access to its users' data, time, and attention to third parties—including advertisers and app developers—for discrete money amounts. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

215.  Those benefits received by Defendant were at the expense of Plaintiffs and Class members.

216.  Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class members. For example, after Facebook's involvement in the Cambridge Analytica scandal came to light in March 2018, Facebook founder Mark Zuckerberg explicitly recognized that Plaintiffs and Class members conferred on Facebook the benefit of their data, stating: "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you." Facebook has similarly recognized that Plaintiffs and Class members have conferred on it the benefits of their time and attention, as evident from the fact that Facebook internally tracks the time its users spend on Facebook (and its family of products) and compares these figures to the time they spend on other competing services.

217.  Facebook acquired these benefits from Plaintiffs and Class members through misrepresentations and deception. Facebook induced Plaintiffs and Class

members to join Facebook based on the promise of stringent privacy protections. All the while, Facebook concealed the scope of the data it harvested from Plaintiffs and Class members and brokered to third parties. Nor did Facebook reveal the manner in which it weaponized Plaintiffs' and Class members' data to "copy, kill, or acquire" Facebook's rivals.

218.   As a result of Facebook's receipt of the direct benefits of Plaintiffs' and Class members' data, time, and attention, Facebook was able to destroy competition, enriching itself at the expense of Plaintiffs and Class members. Although Plaintiffs and Class member conferred on Facebook the direct benefits of their data, time, and attention, Plaintiffs and Class members have been, as a result of Facebook's misconduct: (a) deprived of a marketplace that adequately compensates them for their data, time, and attention with benefits of reciprocal value; (b) forced to accept Facebook's services, which are of inferior quality, with no meaningful alternative.

219.   Facebook has unjustly reaped monstrous financial gain as a result of the misconduct alleged herein. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users. The circumstances alleged herein are such that it would be unjust for Defendant to retain the portion (if not the entirety) of Plaintiffs' and Class members' payments, or the value of other consideration, that should have been earmarked to provide higher quality social networking services, and adequate privacy protections for Plaintiffs' and the Class' private information, including only surveillance and third-party sharing as authorized by its customers.

220.   Plaintiffs seek an order directing Facebook to disgorge these benefits and profits and pay restitution to Plaintiffs and other Class members.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the class defined herein, respectfully request that this Court:

A.   Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given

to the class, appoint Plaintiffs as named representatives of the Class, and appoint the undersigned Plaintiffs' counsel as Class Counsel;

    B. Enter judgment against Facebook and in favor of Plaintiffs and the Class;

    C. Enter injunctive relief to restore competition in the relevant market and its constituent submarkets;

    D. Award damages, including treble damages, and/or restitution to the Class in an amount to be determined at trial, plus legal interest;

    E. Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

    F. Award such further and additional relief as is necessary to redress the harm caused by Facebook's unlawful conduct and as the Court may deem just and proper under the circumstances.

## XII. DEMAND FOR JURY TRIAL

   Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all matters so triable.

Dated: December 9, 2020    Respectfully submitted,

          By:  */s/ Tina Wolfson*

          Tina Wolfson (State Bar No. 174806)
          Robert Ahdoot (State Bar. No. 172098)
          Theodore W. Maya (State Bar No. 223242)
          Rachel Johnson (State Bar No. 331351)
          **AHDOOT & WOLFSON, PC**
          2600 West Olive Avenue, Suite 500
          Burbank, California 91505
          Tel: (310) 474-9111
          Fax: (310) 474-8585
          twolfson@ahdootwolfson.com
          rahdoot@ahdootwolfson.com
          tmaya@ahdootwolfson.com
          rjohnson@ahdootwolfson.com

          *Attorneys for Plaintiffs*